GEORGIA CASUALTY COMPANY *v.* BOARD OF DIRECTORS OF
ST. FRANCIS LEVEE DISTRICT.

4-3341

Opinion delivered March 26, 1934.

*Sam Costen* and *House, Moses & Holmes,* for appellant.

*S. W. Ogan, J. L. Shaver* and *G. B. Segraves,* for appellee.

*James G Coston* and *J. T. Coston,* for indemnitors—cross-appellants.

HUMPHREYS, J. This is an appeal by Georgia Casualty Company from a decree for $38,366 rendered against it in favor of appellee on an indemnity bond executed by it to appellee on March 18, 1930, agreeing to pay not to exceed $40,000 to appellee any loss it might sustain on account of deposits made in the Bank of Osceola, said bank being the principal in the bond and appellant the surety therein. Also an appeal by J. L. Williams, H. V. Cartwright, Ike Miller, and O. W. Knight from a decree in like amount rendered against them in favor of appellant on an indemnifying agreement to reimburse appellant

herein for all loss it might sustain on account of the bond executed by it.

The issues joined by the pleadings were whether the bond sued upon by appellee had expired at the time said bank failed on December 17, 1931, and, if not, whether the bond was obtained through the fraud of appellant's own agent, in which fraud appellee participated; and whether J. L. Williams, H. V. Cartwright, Ike Miller, and W. O. Knight were released from their agreement or undertaking when the bond sued upon was extended.

The bond sued upon by appellee was executed on March 18, 1930, to expire March 18, 1931, in consideration of $5 a thousand or $200, which was paid to B. Frank Williams, the general State agent of appellant. Prior to the execution of this bond, the deposits of appellee were protected by indemnity bonds executed by the Southern Surety Company. J. L. Williams was president of the board of directors of St. Francis Levee District, appellee herein, and president of the Bank of Osceola. B. Frank Williams was his son, who was located in Little Rock in the bonding business, and represented appellant as its general agent in the State for the purpose of transacting all its business. He had a power of attorney from it which read, in part, as follows: "To make, execute, seal, and deliver for and on its behalf as surety, any and all bonds and undertakings, recognizances, contracts of indemnity and other writings obligatory in the nature thereof, which are or may be allowed, required, or permitted by law, statute, rule, regulation, contract or otherwise, and the execution of all such instruments in pursuance of these presents shall be as binding upon said Georgia Casualty Company, as fully and amply, to all intents and purposes, as if the same had been duly executed and acknowledged by its regularly elected officers at its principal office."

An application was made to appellant for a bond in the sum of $15,000 by appellee and said bank, but a bond was written for $40,000 to cover the deposits by the agent in the name of appellant, for which the agent was paid $200. He accounted to appellant for $75 premium only. At the time he wrote and delivered the bond to

appellee, he also delivered his power of attorney to its secretary. On the same date the bond and power of attorney were delivered to appellee J. L. Williams, and the other directors of the said bank executed and mailed an indemnity agreement to appellant, referred to above. No amount was fixed in said agreement. In October, 1930, appellant wrote a letter to appellee stating it was surety on a $15,000 bond for it, and asking for a copy of the bond. Appellee sent the letter to B. Frank Williams at Little Rock, but made no answer to the letter itself. In November appellant wrote asking B. Frank Williams for a copy of the bond, but failed to get it.

In February, 1931, before the expiration of the bond, appellee notified B. Frank Williams that appellant must furnish another bond in like amount or it would get a bond from the Southern Surety Company. On the 26th of February, 1931, he furnished another bond in which the said bank joined as principal and appellant as surety to expire February 26, 1933, and later extended the original bond to March 18, 1932, and afterwards changed the expiration of the new bond to February 26, 1932, and charged and collected a premium of $800 from appellee, which it seems was never sent to appellant.

There is testimony in the record tending to show that B. Frank Williams violated the confidence placed in him by his company, and some tending to show that the officials of appellee participated in the fraud or had knowledge thereof, but there is other testimony tending to show that appellee had no such knowledge, and did not participate therein.

The chancellor found that both of the bonds sued upon were executed by B. Frank Williams, that the Levee District paid the premiums on both bonds, and that it had no knowledge or notice of the fraud practiced upon appellant by its own agent.

After a very careful reading of the testimony, we are unable to say that this finding is contrary to the weight of the evidence. The law is plain that, where one of two innocent parties must suffer on account of the wrongful act of a third party, the one must suffer who placed it in the power of the third party to perpetrate

the wrongful act. *Maccabees, Incorporated, v. Pierson,* 177 Ark. 243, 6 S. W. (2d) 305. In the instant case, appellant placed it in the power of B. Frank Williams to perpetrate the fraud complained of, and must bear the loss resulting therefrom.

The only question now left for determination is whether, under the power of attorney, B. Frank Williams had authority to extend the indemnity bond by changing the date of expiration. Having power to execute the bond in the first instance without restriction as to amount or time and without submitting it to appellant for approval or confirmation, it follows that he might extend the time for any reasonable period. There is no restriction whatever in the power of attorney as to the amount or time for which it might be extended. He could have executed a new bond, and he actually did so, but later chose to extend the original bond. The power to extend a bond is necessarily conditioned upon power to make one for an unlimited time. A majority, however, are of the opinion that the power or authority to make or extend a bond does not confer authority to release a bond given to indemnify the surety against loss. In this latter view, the writer does not concur, being of the opinion that the power of attorney was broad enough to authorize the agent to do anything the officers of appellant might do.

The decree is therefore affirmed on both direct and cross-appeals.

BUTLER, J., (dissenting). I cannot agree to the conclusion reached by the majority of the court. In the discussion of this case it was conceded that the effective bond was that of date, March 18, 1930, and that the bond of February 26, 1931, sometimes called the "second bond," was never in fact accepted by the Levee Board. In fact, when the Bank of Osceola became insolvent, and the Casualty Company was advised of this, the Levee Board based its right to recover of the Casualty Company the amount of its deposit in the Bank of Osceola on the first-mentioned bond, and when the representative of the Casualty Company was making an investigation no information was conveyed to him of the existence of

the last-mentioned bond or of any claim made thereunder; also, when this suit was filed, the right to recover was predicated on the bond of March 18, 1930, and while, by an amendment to the complaint, the bond of February 26, 1931, was pleaded, this was clearly an afterthought.

The power of attorney given by the Casualty Company to its agent, Frank Williams, is set out in the majority opinion, which holds that its terms were sufficiently broad to give authority to alter bonds which had been formerly executed by the agent, and that when he, in February, 1931, altered the bond by changing the date of its expiration, making it to run for a year longer than as originally executed, he was acting within the authority conferred upon him by the power of attorney.

It will be observed that the power given to Frank Williams by the Casualty Company was to "make, execute, sell and deliver for and on its behalf as surety any and all bonds and undertakings, recognizances, contracts of indemnity and other writings obligatory in the nature thereof." The general principles governing the power of an agent acting under authority as was Frank Williams, the agent of the Casualty Company, is stated in 2 C. J. 645, as follows: "Presumptively an agent is employed to make contracts, not to rescind or modify them, to acquire interests, not to give them up, and no power to cancel or vary an agreement is to be inferred from a general power to make it, nor has any agent any implied power to waive or give up rights or interests for his principal, or to increase his obligations and liabilities for the mere benefit of third persons, unless the principal knows or approves of such modifications by the agent. Thus an agent has no implied authority to extend the time for the performance of a contract, except where it is clearly within the scope of his agency. However, a general agent may act under such broad power to contract in his own name, or to make terms or to settle within his own discretion, as to overcome this presumption and bind the principal by a modification, rescission, or release."

In other words, as stated in the case of *U. S. Bedding Co.* v. *Andre,* 105 Ark. 111, 150 S. W. 413, 41 L. R. A.

(N. S.) 413, where the authority must be found from implication, "the act of the agent must be practically indispensable and essential in order to execute the duty actually delegated to him. * * * His implied authority is limited to those acts of like kind with the very act he is expressly impowered to do and from which the authority is implied, but his authority can never be extended by implication to do an act or make an agreement which is beyond the obvious purpose of his employment. * * * Being employed for one purpose, he has no authority to do another, either actual or implied."

An examination of the power will disclose that it did not authorize the agent to alter the bond which he was authorized to write after it was executed and delivered. Under the rules of law, *supra,* an attorney in fact under a power of attorney must conform strictly to the authority expressly given, and his acts are necessarily confined within the express powers granted. The agent, therefore, had no authority to make the alteration by which the obligation of the bond was extended for the period of another year. It is quite evident, from the testimony of the secretary of the Levee Board, that he knew that this was an unusual act, and he must have known from the provisions of the bond itself that no extension of its terms could be made in this manner by the agent. This is clear from a consideration of the following paragraphs of the bond:

"Provided that no erasure or change and no change or waiver of any of the terms or conditions of statements shall be valid unless indorsed on the bond and signed by the president or vice president and attested by one of the secretaries or assistant secretaries of the company."

"This obligation may be continued for any subsequent period by continuation certificates signed by the surety by its president or one of its vice presidents under seal, and attested by its secretary or one of its secretaries."

The provision is clearly made that no erasure or change shall be valid unless made in a specified way,

and it is also clearly directed how the obligation of a bond may be continued; so these provisions apprised the Levee Board of the limitation of the agent's authority, and it knew when the alteration was made that this was beyond the scope of the agent's power.

There is another reason why the Levee District ought not to be allowed to prevail in this action. It is undisputed that the agent of the Casualty Company violated his trust in the execution of the bond of March 18th. The Bank of Osceola made application for a $15,000 bond. It was in this amount that the agent reported to the company that he had written it, and for a bond of this size a premium of $75 was charged, the agent's commission being $22.50, and the balance to be remitted to the company. The agent remitted $52.50, but he collected $200 from the Levee Board. On February 17, 1931, the company notified its agent that on the 1st of March, 1931, it would cease to do business in Arkansas. Two days before the company was to withdraw from the State, without notice to it and without application having been made by the Bank of Osceola, the agent went to the office of the Levee Board, secured the bond of March 18, 1930, which by its terms expired March 18, 1931, and altered the same by making the expiration date March 18, 1932, charging and collecting $200, of which he failed to advise his principal. After the company withdrew from the State, from time to time it wrote its agent to secure and return to it the original bond of March 18, 1930. The agent ignored all of these letters, and finally the company wrote the Levee Board, in September, 1931, that it had written a depository bond to the Levee District on the Bank of Osceola for $15,000 which had expired March 18, 1931, and that it desired to have the canceled bond, or a statement from the Levee Board that it claimed no liability thereunder. Instead of replying to the Surety Company, the Levee Board turned the letter over to the agent, and the first communication the surety company received from the Levee Board was a letter in December giving notice that the Bank of Osceola had closed its doors on the 17th of that

month; that it had a deposit of $38,366.05 in said bank, and that it claimed and demanded the payment of the same by the Casualty Company by reason of a bond executed March 18, 1930, expiring on the same date in 1932. This was the first knowledge the Casualty Company had that any such bond was in existence.

From the testimony of the secretary of the Levee Board, it is clear that he knew that the action of the agent in writing a bond on February 26, 1931, for $40,000, and a day or two later coming in and changing the expiration date on the bond of March 18, 1930, and his request for the return of the bond written February 26, 1931, and later on his change of the bond written February 26, 1931, so as to make it appear that it was written preceding that date, was irregular and so suspicious that he (the secretary) refused to surrender either one of the bonds. With these facts within the knowledge of the Levee Board, when it received the letter from the Casualty Company in September, 1931, asking for a return of the canceled bond, the amount of which was stated, it then knew, or ought to have known, that the agent had practiced a fraud upon the Casualty Company, and good faith demanded that it should have answered the letter of the company disclosing all the facts within its knowledge. Had it done so, the Casualty Company would have had the opportunity to protect itself by cancelling the bond, and the Levee Board could have protected itself by a withdrawal of its deposit from the Bank of Osceola.

It is elementary that one may estop himself, either by his positive acts or by omission, from asserting a right against a party who has been injured. It is difficult to lay down any accurate rule by which estoppels *in pais* may be measured, for each case must depend upon its own facts, and in no two cases are the facts precisely the same. But this is a case which calls for application of the doctrine, for clearly good law and good morals required the Levee Board to disclose to the Casualty Company the fact that its agent had written a bond in a greater amount than it had supposed and then, by altera-

tion, had extended its obligation for a year longer than when the bond was written, and to disclose to the Casualty Company that it then claimed that a valid and subsisting bond for $40,000 existed for which the Casualty Company was liable. As already said, had the Levee Board done this, both it and the Casualty Company had ample means of protection, and by its silence it acquiesced in the fraud of the agent, and should not be allowed to recover in this case. It follows that there was no liability on the part of the indemnitors.

I think, therefore, that the judgment of the trial court should be reversed, both on direct and cross-appeal, and that the case should be dismissed. I am authorized to say that Mr. Justice McHANEY concurs in the views I have expressed.